and we'll hear from Mr. Pena. Good morning, Your Honor. Jay Pena of Pope and Pena PC for the appellate, and may it please the Court. Thank you. Whenever you're ready. Yes, Your Honor. I'm here to argue that the Council's reliance on erroneous legal standards led to the denial of 18 claims for skilled nursing services, and so we respectfully request that this Court reverse the trial court's decision and remand the case for further proceedings consistent with the correct legal standards. It's important to note that the Court's holding will be narrow in this case because it involved a review of claims that fall within a particular service period. In this case, it's 2008 to 2009. May I ask, is Angelitos still in business? Yes, Your Honor, it is. Okay, so this $1.1 million, was that withheld or was that deducted from subsequent payments owed to Angelitos? It's still in business, Your Honor, but it doesn't offer these particular services that has been on hold up until this point. I see. Okay. Thank you, Your Honor. And so, there was a regulatory overhaul . . . Yes, sir. I just want to ask you just sort of a housekeeping question. Your brief, and correct me if I'm wrong, seemed to focus on the skilled nursing part of this which had to do with insulin. The brief on the other side mentioned that, of course, but then also talked about the OASIS issue and the osteoporosis issues. I just want to be clear, which patients are you arguing to us on appeal? Are you arguing all 18, which cuts across a few different issues, or only the insulin issue, which I think applies to a subset of the 18? Your Honor, the case absolutely does carve out just the skilled nursing patients, and we're arguing, we're making a blanket argument as to all patients here today. Well, okay, well, so in other words, the issues that we're required to address because you're bringing them before us deal only with the skilled nursing as to insulin injections. Is that correct? It would be skilled nursing in general, Your Honor, because that would be, what we're doing is we're addressing the fundamental premise or the regulation that the counsel refers to in denying even the insulin patients. Is that the Tenth Circuit case issue where you're saying that the wrong standard was used as to everyone? That is correct, Your Honor. That is the Tenth Circuit case issue, and that is the case where Caring Hearts basically argues that Medicare did not know its own laws, and in this case, the counsel were going to show that it's cited and relied on provisions that are inapplicable to the appellant under Medicare Part B. The agency does not provide services under Medicare Part A and never has, and the regulations cited by the counsel relate to Medicare Part A. I provided the court with a copy of the table of contents of Title 42 of Chapter 4 of the Code of Federal Regulations, and I believe if we look on page 3 through 6 of that handout, there's a subchapter there, it's Subchapter B that's labeled Medicare Program, and that provides the regulatory standards for Medicare Part A and Medicare Part B. So the counsel's regulatory citations are filled with references to Part 409 of Title 42, which is titled Hospital Insurance Benefits. That is Medicare Part A, and so their use of 409 is misplaced. In fact, if we were to make reference to 409.2, which is one of the introductory statutes to Part 409, it unequivocally specifies the scope of Part 409 as follows, and I'll quote, Subparts A through G of this part describe the benefits available under Medicare Part A and set forth the limitations on those benefits. So the proper legal standard for the coverage of home health services provided under Medicare Part B is found below in Part 424, and that is appropriately titled, and I quote, Conditions for Medicare Payment. So within Part 424, you will find also 424.22, which contains the regulation titled, and I'll quote, Requirements for Home Health Services. These are what Congress intended as the conditions for payment for home health agencies billing under Medicare Part B. What part are you talking about there, home health services? Yes, Your Honor, that would be under Medicare Part B. It's Part 424, and in the handout, it's titled Conditions for Medicare Payment, and 424.22 is the requirements for home health services. So then, Your Honors, the question for the Council, for Medicare Council, is whether back in 2008 to 2009, any of the conditions of participation in Part 424 make reference to or require Medicare Part B agency to comply with conditions of Medicare Part A, as noted in Part 409, and we could find none for that particular time period because the two parts serve different purposes and deal with separate aspects of Medicare coverage. So, to illustrate the purpose, if we were to look at today's regulation in Part 484, that would be 42 CFR 44.75, it relates to the conditions of participation for home health services with regard to skilled nursing services. That section makes clear reference to 409.44, which is the case that's cited here today, or the citations that are relied on by the Council, but if we go back to the relevant time period, back then, we had 44.30, and that was the same conditions of participation as it relates to skilled nursing services, but it made no reference to Part 409. And so, Your Honors, the Federal Register, which I've provided a copy that starts on the record, I'll cite it as, it's 59 Federal Register 65482-01. That Federal Register, I've highlighted some key parts, it clarifies the distinction between Medicare Part A and Part B services, and it reads on page 10 of that handout, we propose that all Medicare home health services would be covered under Part A if the beneficiary had Part A entitlement, and if the beneficiary had only Part B entitlement under Part B. We propose that if all coverage requirements were met, payment could be made for an unlimited number of covered visits. So the Federal Register makes clear that Congress intended for home health services to have distinct regulations with regard to coverage requirements. Part B agencies who wanted to receive coverage for unlimited visits, like Part A agencies, were obligated to follow the provisions in Part 409. I think I understand what you're talking about, but if you could relate what you're talking about to some error that the district court made, where does this cash out as an error? It cashes out as an error, Your Honor, within the context of what would be considered arbitrary and capricious. What happens is that the counsel's ability, if the judgment order is upheld, then what we're essentially upholding is the ability of the counsel to be able to jump from Part A regulations, and in effect, agencies like Angelitos would not have notice of what exactly it is that they violated. In this context, going back, how would Angelitos know that it would be held to 409 standards, which are arguably stricter than marked in Medicare Part B standards because of the unlimited visitation situation. Okay. And this is an argument that you raised in the district court? This is an argument that we raised throughout the entire process. There was a bit of cloud throughout the entire process because of the number of regulations at issue. So it's quite a difficult argument to make, but it's not until we take a look back and look at the titles and the subtitles that we've finally realized the context and where the error standards derive from. Okay. Thank you. So, Your Honors, if we also make reference ... Yes. Again, I mean, I understood this in a very simplistic way, that these were basically documentation failures, not giving unnecessary care, not care outside the accepted medical standards and so on, but they were documentation failures. You know, the doctor didn't sign such and such. You didn't have this 100-point OASIS statement filled out and so on. So are you saying that all that comes from Part A, or is that also ... Are those ideas conditions to payment under Part B? So, Your Honor, the Part B indices are regulated by 424 and 484, and the distinction between the two is that one is conditions for Medicare payment, one is the home health services are conditions for what would be considered, I guess, certification standards or standards for participation in the Medicare program. I think that Congress clearly intended to note which types of violations would be the types of violations that would be subject to recoupment. What counsel's essentially done is grabbed 409 standards and applied them here and expanded their recoupment ability. Of course, the case is here today that they certainly have that, but it wasn't the case back then. So you're ... Okay. So the recoupment ... So you're agreeing with me that most of this is based on documentation failure? Yes. Okay. So you're agreeing with me that most of this is based on documentation failures and you're contending that those regulations did not specifically apply in home health services at the time in question, and that sort of would explain why Caring Hearts is written the way it is. Your Honor, the documentation failures actually stem from a lot of secondary authority under their own procedures manual. I'm not aware of anything that allows them within the actual regulatory standard to grab these subparts and combine them together, but their procedure manuals were produced in such a way to where they also blurred the distinction. So those documentation standards, like, for example, the insulin situation, wherein their own regulations or their own secondary authorities note that there's a presumption, for example, that a patient doesn't have an eligible caregiver, or that there's a presumption that the person that is the caregiver at the time in a person's residence, there's a presumption that they're not willing or able to assist with insulin injections. What they've done is they've taken that secondary standard and said, well, it violates 409, and because it violates 409, it's simply a basis for recoupment. But they're interpreting their own regulation, and I don't know that an agency would be given such deference in its own interpretations with regard to federal guidelines. Another part of it that sort of bothered me was that it said there must be something about the records here, because it says that the patients, probably because of their diabetes, might not be able to see very well, but they might be able to inject themselves. And the only problem would be that they couldn't put the insulin into the syringe, which would be a big problem if you spilled it or whatever, didn't get the right dosage. That's correct, Your Honor. They were interpreting the medical records in doing this. Yes, Your Honor, and in doing so, we note that the Caring Hearts Court, at least, what they look at the requirements, they tend to put an emphasis on the fact that there's a plan of care that's certified by a physician. And there's some question as to whether or not, or actually there's an assertion that the council should at least premise off of that standard and comment as to whether or not their services are reasonable or necessary within the context of that certification. I would point to the, to Your Honors as well, that even the certifications for plans of care are standard for Medicare Part A, and there's a different plan of care certification for Part B. For some reason, well, not for some reason, but illustrating the fact that the council has cherry-picked from parts of subsections 409, I would point to several sections in 409 that relate to home health that are really never cited. For example, 409.48, I'm not sure if, maybe I might have tendered the, Your Honors, a copy, but even that regulation relates to the unlimited visits. So one would think, so is that a legal nullity at this point for Medicare Part B visits? Because Medicare Part B agencies, they don't bill with unlimited visits. They bill under a grouped billing model. I know you rely on the Caring Hearts decision from the Tenth Circuit for a broad standard that you say was not properly applied here, but specifically, what kinds of services was the Caring Heart decision dealing with? Was it these kinds of services, or was it something different? They're exactly the same. Caring Hearts, Angelitos, and if I'm not mistaken, even the Cypress appellant or the plaintiff, they all rendered the same types of services under Medicare Part B. They were all subject to the same. Caring Hearts wasn't about physical therapy? Yes. And so what happens is Caring Hearts restricts its holding to therapy, but it also mentions skilled nursing within the same context and says, well, it's the same thing with skilled nursing as it is for therapy. Okay, and what year was that decision? That Caring Hearts was ruled on? I believe it was 15. Since we're talking about what regulations apply to what kind of service. 2008, it was the same. And then I think following Caring Hearts was Cypress, which introduced Caring Hearts into Fifth Circuit, Your Honor, but Caring Hearts, of course, carved out the physical therapy situation, and because the plaintiff in Cypress did not raise Caring Hearts as an issue, they stood with the same standards in Cypress. So I believe there's no coincidence that we're here today where some of these patients received, for example, both physical therapy and skilled nursing, but all of them here today are denied based on skilled nursing services. Okay, well, you have a chance for rebuttal. Thank you, Your Honor. Thank you. Ms. Myron.  May it please the Court, Laura Myron, for the testimony. Thank you, Your Honor.  Thank you, Mr. Chairman. As far as I am aware, the plaintiff has never raised the suggestion that Section 409 was not the correct part of Medicare. I mean, if this is back from 2008, it does seem to distinguish between hospital and home health. Well, Section 409, and this is on page 4 of his handout, provides for home health visits post-hospital care. So those provisions do cover home health care visits by skilled licensed nurses for patients who are post-hospital care. And as far as I know, that's the provision that was applied throughout the administrative review process. It was considered under the district court. And as far as I know, plaintiff has never specifically objected to say that these were claims that were supposed to be considered under Part B or Part A. As far as I know, that's never been part of the consideration in this case. We'll take that for your argument, but why wouldn't it be covered under Part B rather than Part A? I don't know, Your Honor. I don't know exactly what the specific services at issue provided, how they were billed. Well, excuse me. I mean, there's a multi-thousand page record here about these people allegedly being homebound and needing regular insulin and something about osteoporosis as well. So it's not hospital care. No, Your Honor. But under 409, it's also not hospital care. It's home care that is provided for patients after hospital visits. And it's home health services. Well, let me just say, my mother received home health care for wound care on a number of occasions, and I'm sure some of those were back as far as 2008. And that was not post-hospitalization. I mean, we've had a lot of cases involving home health care from, in fact, this Well, I guess what I'm saying, Your Honor, is that the same kinds of services may be provided to patients under different rubrics. The rubric in this case... And where is the documentation requirement that is precisely the same? I mean, you know, the government has to turn square corners. I understand, Your Honor. And as far as I know, 409 is the correct rubric for consideration of these claims. What do you mean, as far as you know? You're the government's attorney. Yes, Your Honor. But let me just say, the way that this works is that the provider is given a number of opportunities to provide additional documentation to support claims for payment. At every turn throughout this, they have not provided a particular argument that said, hey, this is, you know, you have considered this under Part A. You should have considered it under Part B. So I don't know where they're getting that. I don't... The record doesn't support the suggestion that this should have been considered a Part A versus a Part B question, and that's... Well, basically, you don't know enough about the Medicare to say whether they're right or wrong. I mean, leave aside the issue of forfeiture. You're not in a position to tell us whether that's right or wrong. You can file a 28J letter. Look, Your Honor, the question in this case is whether these 18 individual claims were correctly... Whether there's substantial evidence to support that they were correctly denied. Well, there were 18 claims that were extrapolated into well over a million dollars. So each individual claim must be considered on its own merits and whether there is objective clinical evidence to support that particular claim. But that wasn't your basis for denial. The basis for denial is what I... Because you're not arguing that there was not a physician approval. You're arguing that the physician didn't sign the paper. You're arguing that they didn't have the patient history filled out by the home health care provider, leaving aside the fact, of course, that a reasonable doctor will do that as well. I think I'm correct in saying these are all documentation failures. I think that's right, Your Honor, and the regulations are very clear that it is the provider's burden to provide the documentation to support coverage, that they have multiple opportunities to correct any documentation failures in the administrative review process, which they failed to do here. There are numerous instances, especially with regard to the OASIS and to the record, the appropriate forms and documentation. So there's no suggestion that this isn't the kind of thing that they knew how to do or that they didn't understand what form it would take. And for those claims where that documentation was correct, the claims were paid. And it's helpful to compare. We're down to 18 claims, but it's helpful to compare the claims that were in the record at the outset that have been since determined to be properly paid versus those that remain in which coverage was determined to be improper. But it's 18 claims, but it's extrapolated to a million dollars, right? These 18 patients did not incur a million dollars worth of reimbursements. That's correct, Your Honor, but if you were to decide that some claims, you know, were not properly paid individually, that it would go back for additional extrapolation and the amount might change. That will likely happen anyway because some claims were reversed by the district court and we have not appealed that particular claim. So there will be an additional recalculation of the total amount. And the question is whether each of the individual claims supported by substantial evidence in the record. You must consider each one individually. Ten years from now, we'll be back up on appeal. Counsel, I'd like to ask you the question that I first asked counsel opposite, which is what issues are actually presented in this case by the briefing? Because I had understood this case to be very different from the discussion that we appear to be having. I thought that this case was about a discrete number of claims. Sure, they were extrapolated. I get that. But I also understand that there's no challenge being made to the extrapolation in this case and that that's been conceded by the other side. Yes, Your Honor. So that's not in front of us. So I also thought that going up through the various levels of review, we started out with more than 18. I don't remember exactly how many, but in the twenties. Forty-four. Okay, well, so 44. And that some of these claims fell away as we went up through the process because they were, in fact, found to have been erroneously denied. That's right, Your Honor. And so we end up here with, I think, 18. That's right, Your Honor. The appellant's brief refers to them by the first two initials of names, so it's difficult for me to figure out exactly how many, but let's say 18. I thought that a subset of those dealt with insulin. Okay. And I see the brief. Correct me if I'm wrong. I gave the other side an opportunity to do it, but I didn't get an answer. Correct me if I'm wrong. I thought the brief only dealt with insulin and not with OASIS and not with osteoporosis. And so I'm trying to figure out what exactly is in front of us. I think that's right, Your Honor. As far as I understand, they have not challenged the – before this court, they have not challenged the denials based on the lack of OASIS or the failure to include a signed and dated plan of care. As I said, there are plenty of claims in the record that do have those documentations, and they were appropriately paid where the rest of the conditions were satisfied. And so what I understood to be remaining of this case is whether the claims that were denied because it was not considered reasonable and necessary for insulin services to be provided as a skilled nursing service, whether those were appropriate or insupported by substantial evidence in the record. I'm happy to kind of run through why they are. Finally, let me just ask that I am also surprised at the sort of the 409 versus whatever argument that's being made here because I didn't understand that to be an argument that's even made in the brief. No, Your Honor. Nor did I understand it to be an argument made before the administrative review process. And so I don't think that it's appropriately before this court. I did want to touch briefly on Your Honor's question about caring hearts. Yes, please. So there's a paragraph in caring hearts about skilled nursing services at 975 and 76 of the opinion that is specifically talking about the provision that addresses when observation and assessment may be provided by a skilled nurse in a home health care setting and the documentation requirement under the both 2008 and 2010 versions of that provision. And the Tenth Circuit is concerned that a later change which required more specific documentation was not at issue in the 2008 claim. None of the claims at issue here are for observation and assessment so that particular paragraph isn't applicable to these claims and it's not appropriate to extrapolate a larger principle about whether it is sufficient for a provider to submit only documentation that the care was provided by a physician consistent with prevailing medical standards. Certainly that's important. It's accounted for throughout the regulations, but there are additional documentation requirements, some of which speak to whether the patient actually has the conditions that support the kind of care that's prescribed by the doctor and that they have it. There is no doubt. You do not challenge that these people needed insulin, injections of insulin, right? No, Your Honor. The reasonable and necessary pertains to whether they required homebound health care, which is a nurse coming by and sickening them. And it just struck me as very odd where the brief says, or maybe the magistrate opinion, well, admittedly this person can't see very well,  That's absurd. Your Honor, the question is whether a skilled licensed nurse should be covering. I'm sorry, but if there are doubts about whether the person can see well enough to put the insulin in, insulin is a very valuable commodity as we know. You have to take very good care. You have to measure it very precisely lest you don't get dead. And so I found that bizarre. Absolutely, Your Honor. I think that's why this is on page 173 of the record. It says that a home health aid, those kinds of services may be covered for home health aids. The question is, as I sort of started to say, is whether this is the kind of thing that, and this is the regulations on A1 of our appendix, whether the service is so inherently complex that it can safely and without the supervision of a professional licensed nurse. And I think the millions of diabetics who self-inject their own insulin, you know, millions of diabetics have serious eye problems. Absolutely, Your Honor. And you're not dealing with people who are in the highest income range and so on either. I understand. And the regulations also provide that, you know, where there are special medical complications that, you know, a service may be considered a skilled, may be covered as a skilled nurse. But Medicare is refusing to pay these because even though you're not challenging that the doctor approved this service, that the doctor didn't sign the right paper at the right time. Well, I think the plan of care, the signed and dated plan of care is a separate question and that's important because these services are provided for specific periods of time and it's important to match up the patient's condition at that period of time. Well, insulin dependent diabetic is not something that comes and goes for most people. Sure, Your Honor. But the requirement that a signed and dated plan of care be included to support payment under Medicare is, you know, Medicare pays billions of dollars of claims every year and it's important. No. And we've had very grotesque home health service fraud cases, which this is not. This is a documentation case as you just, as you admitted earlier. Absolutely. And, you know, this is the kind of documentation that providers know how to, you know, submit. Most of the claims in the record here have that. There was opportunity to cure the document, identify documentation issues in the administrative review process. And for the, there are two. The only way, I mean, you can't backdate the doctor's signature, right? You know, I don't, I couldn't comment on how that might. Well, you say an opportunity to cure. I think you, what, You know, you could come up with contemporary records that cured that up that cured the original documentation, but you couldn't backdate your records to do that would probably be considered fraud. There are most of the claims in this case have the appropriate documentation for home health care services. You know, The plan of care is the framework under which the services are provided. And so providers who provide these services should catch those kinds of claims in the process. They should recognize that, you know, that is part of what's required for payment under Medicare. And it's important that plan of care be tied to a specific period of time in the same way that the patient's condition must be established for the period of time that the claims are being paid. And I also want to say that the, the question of whether that, that sort of separate from the question of whether the services for insulin injections were reasonable and necessary. And the, the guidance is quite clear that something that we expect patients and their families to be able to do that fits consistently with the way that regulations understand what skilled nursing services are. And there are exceptions, as I mentioned, for special medical complications, but the obligation is on the provider to demonstrate that the patients actually are medically, excuse me, are mentally or physically incapable of injecting their own insulin. And that there's no willing able caregiver in the home to provide it as, but I mean, again, that's, isn't, isn't that overriding the doctor's considered judgment? Doctors aren't stupid about this kind of thing. No, Your Honor. It's something that we're asking for in concert with the doctor's judgment. And certainly the regulations, well, actually you're not, you're, you're overriding what the doctor said. I think doctors know the difference between home health aid and skilled home skilled nursing or whatever you call it, the next higher step. I don't think that's fair. Your Honor, the, the regulations require both that the doctor prescribed the care and that it be consistent with, you know, prevailing medical practice. And also that, that the provider established that the patient in fact needs the care, that they have the conditions that require that particular care. And, you know, it would be, it would eviscerate most of the regulatory requirements for these kinds of payments. If all that were required is a prescription from a doctor that a patient needs particular care. And I don't mind cut out a whole lot of expense too. I don't think so. Your Honor, quite the opposite. I think I'm talking about all the bureaucracy that you need, but. Sure. Certainly Medicare is complicated, but I think if all you had was a requirement that there be a prescription from a physician and that it be consistent with prevailing medical practice, that would dramatically increase the number of claims that Medicare we're facing. And it would make it significantly more difficult to weed out those claims that are fraudulent, which is important to, as I said, the billions of dollars that Medicare pays out in claims each year. If the court has no further questions. Thank you, ma'am. Thank you, Mr. Pena. Thank you, Your Honor. And I also appreciate the government acknowledging that most of the claims in the case do have the appropriate documentation. But to the degree that the government would argue that this was not raised earlier in proceedings, we've always raised the issue that the government has generally just miscited Medicare coverage guidelines, and they've used a surfeit of different Medicare regulations. But Cypress at 324 addresses proceedings involving Medicare appeals, and it notes that such proceedings are not sufficiently adversarial to trigger a strict issue exhaustion requirement. And so I would ask Your Honors to consider even this, what would be a patent regulatory situation or deficiency to be considered, because in the very end, really what the appellant is asking is, if this case is remanded, tell us which regulations under Part 424 and 484 specifically that we need to address, even if the deficiency, as alleged, is just a documentation-based deficiency. Nobody denies that all of these patients or their health care treatment was certified by a physician. And so again, Your Honors, I would close with noting that the counsel has relied on erroneous legal standards to deny the appellant's claims, and we respectfully request that this court recognize the misapplication of the law and remand this case for further proceedings consistent with the correct legal standards in 424 and 484. Thank you for your time. And that concludes unless Your Honor has more questions. Okay. Thanks a lot. Thank you.